## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## TEXARKANA DIVISION

| | | |
|---|---|---|
| **ROBERT HOWARD AKINS and EMILLIA KAY AKINS, individually and as next friends of CHARLES SCOTT AKINS, and CHARLES SCOTT AKINS, individually,** | § § § § § | |
| | § | **Case No. 5:19-cv-121** |
| *Plaintiffs*, | § § | |
| **v.** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **RIDDELL, INC., RIDDELL SPORTS, GROUP, INC., ALL AMERICAN SPORTS CORPORATION, and BRG SPORTS, INC.,** | § § § § § | |
| *Defendants*. | § | |

### PLAINTIFFS' ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

Robert Howard Akins ("Robert") and Emillia Kay Akins ("Emillia") (collectively, "Scott's Parents"), individually and as next friends of Charles Scott Akins, and Charles Scott Akins ("Scott"; collectively with Scott's Parents, "Plaintiffs" or the "Akins"), individually, file this their Original Complaint ("Complaint") complaining of Defendant Riddell, Inc., Riddell Sports Group, Inc. (together, "Riddell"), All American Sports Corporation d/b/a All American Reconditioning Company and/or Riddell Sports/All American ("All American"), and BRG Sports, Inc. ("BRG"; collectively with Riddell and All American, the "Riddell Defendants" or "Defendants") and would respectfully show unto the Court as follows:

### I.
### PARTIES

1.    Plaintiff Robert Howard Akins is an individual and a resident of Bowie County, Texas and is the father of Charles Scott Akins.

2.      Plaintiff Emillia Kay Akins is an individual and a resident of Bowie County, Texas and is the mother of Charles Scott Akins.

3.      Plaintiff Charles Scott Akins is an individual and resident of Bowie County, Texas.

4.      Defendant Riddell, Inc. is an Illinois corporation with its principal place of business in Illinois. It may be served with process through its registered agent, Corporation Service Company, 211 7th Street, Suite 620, Austin, Texas 78701.

5.      Defendant Riddell Sports Group, Inc. is a Delaware corporation with its principal place of business in Illinois. It may be served with process through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

6.      Defendant All American Sports Corporation d/b/a All American Reconditioning Company and/or Riddell Sports/All American is a Delaware corporation with its principal place of business in Ohio. It may be served with process through its registered agent, Prentice Hall Corporation, 211 E. 7th Street, Suite 620, Austin, Texas 78701. All American Sports Corporation is a wholly owned subsidiary of Riddell Sports Group, Inc.

7.      Defendant BRG Sports, Inc. is a Delaware corporation with its principal place of business in California. It may be served with process through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

## II.
## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the subject matter of this case because there is complete diversity of citizenship between Plaintiffs and Defendants and the amount in controversy exceeds $75,000.

9.      This Court has jurisdiction over Defendants because they have purposefully availed themselves of the privileges and benefits of conducting business in the State of Texas, and in doing

so, Defendants committed torts and other illegal acts that comprise the subject matter of this suit. Specifically, Riddell Defendants have marketed, sold, and distributed their products into the State of Texas and directed communications to the State of Texas in a manner that directly relates to, and ultimately caused, the events that give rise to this litigation. Further, the Riddell Defendants have employees, agents, and sales representatives in the State of Texas, whose conduct directly relates to, and ultimately caused, the events that give rise to this litigation. The Riddell Defendants own and/or lease property in the State of Texas from which their employees, agents, and sales representatives engaged in business and tortious conduct that form the basis of this lawsuit. Defendants' contacts with the State of Texas were purposeful and directly connected to the events that give rise to this litigation. Indeed, without Defendants' overt acts of owning and/or leasing property in the State of Texas; and traveling to, contacting, selling and/or distributing their products into the State of Texas, the injuries giving rise to this lawsuit would not have occurred. As such, traditional notions of fair play and substantial justice will not be offended by this Court exercising jurisdiction over Defendants.

10.    Venue is proper in this Court and in this District because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District. 28 U.S.C. § 1391(b)(2). Specifically, Defendants caused their products to be sold to James Bowie High School in Simms, Texas, where Scott played football. Scott sustained the injuries that give rise to this case in Bowie County, Texas as a result of Defendants' defective products.

### III.
### FACTUAL BACKGROUND

**A.    Scott suffered a devastating brain injury due to the defective design, manufacturing, reconditioned, and marketing of the Helmet by the Riddell Defendants.**

11.    On September 22, 2017, 17-year old Scott suited up to play varsity football for the James Bowie Pirates under Friday night lights. Scott wore a Riddell Revolution Speed helmet that

bears a sticker indicating that the shell was manufactured in 2010 (the "Helmet"). The Riddell Defendants, operating out of their facility in San Antonio, Texas, reconditioned the Helmet in 2017.

12.    During the game, following a hit, Scott sustained a left subdural hematoma because of the defects in the Helmet. After Scott made his way to the sideline, he collapsed and became unresponsive.

13.    Scott was transported by ambulance to the hospital. There he underwent left decompressive hemicraniectomy. Initial imaging demonstrated a large, left-sided subdural hematoma with a midline shift and significant ventricular effacement. Scott was intubated in the ER with a low Glasgow Coma Scale.

14.    Scott suffered a severe brain injury that resulted in spastic quadriplegia. He has been hospitalized extensively ever since and has undergone multiple surgeries with limited prospects of ever improving.

15.    Ever the fighter both on the field and off, Scott continues to doggedly pursue physical therapy to attempt to regain some function. The progress he has made has been agonizing and required multiple surgeries and a team of doctors, nurses, physical therapists, and his family's unwavering support. Despite his best efforts, Scott still lacks control of most of his extremities and cannot reliably move his left side. He is unable to speak clearly and uses signals with his right upper extremity to communicate.

16.    Scott's injuries are permanent, catastrophic, and life-altering. The unfortunate reality for Scott is that he will never live independently as a result of his injuries and will need continuous care, twenty-four hours a day and seven days a week for the rest of his life.

17.    In the nearly two-years since Scott was hospitalized, the Akins' lives have been

turned upside down. Scott has been hospitalized both out of state and hundreds of miles from home in Houston. To help her son face this devastating injury, Emillia has had to move to wherever Scott receives treatment for long stretches, oftentimes living in an RV near where Scott has been hospitalized. Robert continues to travel back and forth from home to be with his son, all while trying to balance work. Words cannot adequately describe what the Akins have been through.

18.    At all times material, Scott used the Helmet in a reasonably foreseeable way.

19.    At all times material, Plaintiffs were unaware of the actual risk associated with the Helmet, but the Riddell Defendants were aware that the danger associated with the Helmet would not be readily recognizable to the ordinary user of the Helmet, like Scott.

**B.    The Riddell Defendants knew better than to design, manufacture, recondition, and market the defective Helmet, but ignored its defects and did so anyway.**

20.    The Helmet—a Riddell Revolution Speed—is no stranger to catastrophic injuries like Scott experienced. The Riddell Defendants have known—for years—that the Revolution line of helmets, which the Helmet is a part of, is defective and does not adequately protect the brains of adolescents—the targets of much of the Riddell Defendants' marketing and sales efforts. Studies have demonstrated the inadequacy of the Revolution line of helmets, which the Helmet is a part of. The Riddell Defendants knew of this data, much of which was generated in refute to a blatantly problematic Riddell-sponsored study that drew the ire of the Federal Trade Commission. Yet the Riddell Defendants took no action to recall the Helmet or adequately warn about the Helmet's defects.

21.    Both the Helmet's design and the materials the Helmet is constructed with are defective. At all times material, the Riddell Defendants knew of the data which showed the Helmet was defective. In the years preceding Scott's injury, the Riddell Defendants have been the subject of numerous lawsuits and government investigations concerning the design, manufacture, and

marketing of Riddell helmets. Verdicts and settlements against the Riddell Defendants reach well into the eight figures. The Riddell Defendants have taken no action to recall or warn about their defective line of Helmets even as they continue to amass data confirming the defects.

22.     As designed, manufactured, reconditioned, marketed, sold, and distributed, the Helmet was unreasonably dangerous and defective because it lacked a safe means of attenuating and absorbing the foreseeable forces of impact in order to minimize or reduce the forces and energy directed to the head of a player—like Scott. Further, the shock attenuating system was not safely configured based on known data and technologically and economically feasible alternative designs that are safer. Those designs include other helmets designed and manufactured by the Riddell Defendants. Despite being aware of all of this, the Riddell Defendants failed to warn end users of the Helmet of the defects.

23.     Riddell Defendants reconditioned the Helmet. When doing so, the Riddell Defendants did not replace and/or configure the liners with appropriate impact-protection liners. Consequently, the Helmet lacked a safe means of attenuating and absorbing the foreseeable forces of impact in order to minimize or reduce the forces and energy directed to the head of a player—like Scott.

24.     At the time of the Helmet's reconditioning in 2017, the Riddell Defendants were aware of improved liner materials—such as dual density foams—that provided superior impact protection and were using such materials in their helmets. Thus, the Riddell Defendants had a econonimcially feasible alternative design at their disposal that was safer. Despite being aware of these safer alternatives, the Riddell Defendants failed to design and manufacture replacement liner materials to recondition the Helmet appropriately. The Riddell Defendants did not warn Plaintiffs of the Helmet's defects following the reconditioning.

25.    The Riddell Defendants are commonly owned by Fenway Partners, LLC, a private equity company that has acquired multiple helmet manufacturing companies over the last decade and merged them into Defendant BRG. The stated purpose for these combinations and the broader acquisition strategy is to increase efficiency and share knowledge and expertise amongst the Easton-Bell, Riddell, and Giro companies that formerly designed, manufactured, marketed, distributed, and sold their helmets as competitors. The Riddell Defendants have common management and, on information and belief, overlapping directors. BRG, Riddell, and All-American are successors in interests that retain the liability of several companies that have been shuttered or collapsed into one another under Fenway Partners, LLC's management.

26.    Under the direction and control of Fenway Partners, LLC, the Riddell Defendants along with their predecessors, officers, directors, employees, partners, associates, and agents, caused the Riddell Defendants to design, manufacture, create, construct, fabricate, import, distribute, retail, wholesale, test, analyze, modify, control, advertise, label, promote, inspect, recondition, and maintain their merchandise, including, but not limited to, the Helmet. The Riddell Defendants are liable for the acts and omissions of their predecessors, officers, directors, employees, partners, associates, and agents under the theories of respondeat superior and agency.

27.    Under the direction and control of Fenway Partners, LLC, the Riddell Defendants along with their predecessors, officers, directors, employees, partners, associates, and agents, failed to adequately and properly manage and operate their business and their design, manufacturing, and distribution centers; failed to adequately and properly supervise their employees and agents, including designers, inspectors, quality control agents and other manufacturing, distribution, and delivery personnel; and failed to act without negligence or conscious disregard or other wrongful conduct regarding the designing, testing, manufacturing,

inspection, delivery, advertising, marketing, reconditioning, and maintenance of their merchandise, including, but not limited to, the Helmet. The Riddell Defendants are liable for the acts and omissions of their predecessors, officers, directors, employees, partners, associates, and agents under the theories of respondeat superior and agency.

## IV.
## CAUSES OF ACTION

### COUNT ONE: DESIGN DEFECT

28.     Each of the foregoing paragraphs is incorporated herein for all purposes.

29.     At the time the helmets were designed, manufactured, sold, and distributed by the Riddell Defendants, the Helmet was defective in design, unreasonably dangerous, and unsafe for its intended purpose because it did not provide adequate protection against the foreseeable risk of brain injury. The design defect includes, but is not limited to the following:

  a.      failing to design, manufacture, and recondition the Helmet with a safe means of attenuating and absorbing the foreseeable forces so that upon impact the Helmet would minimize and/or reduce the force and energy directed to the brain;

  b.      designing, manufacturing, and reconditioning the Helmet with a shock attenuating system that was not as safely configured as the Riddell Defendants' other products;

  c.      failing to properly and adequately test the Helmet; and

  d.      other defects in the design and manufacture of the Helmet that may be discovered during the course of this matter.

30.     These defects rendered the Helmet unreasonably dangerous as designed taking into account the utility of the product and the risks involved.

31.     There was a safer alternative design that in all reasonable probability would have prevented or significantly reduced the risk of the injury in question without substantially impairing

the Helmet's utility. The alternative design was economically and technologically feasible at the time the Helmet left the control of the Riddell Defendants.

32.    The above-referenced design defects were the producing cause of Scott's injuries and Plaintiffs' damages.

## COUNT TWO: MANUFACTURING DEFECT

33.    Each of the foregoing paragraphs is incorporated herein for all purposes.

34.    At the times the Helmet left the possession of the Riddell Defendants, the Helmet deviated in its construction or quality in a manner that rendered it unreasonably dangerous.

35.    This manufacturing defect rendered the Helmet dangerous beyond what an ordinary user of the Helmet, with ordinary knowledge common to the community, would have anticipated concerning the product's characteristics.

36.    The above-referenced manufacturing defect was the producing cause of Scott's injuries and Plaintiffs' damages.

## COUNT THREE: MARKETING DEFECT

37.    Each of the foregoing paragraphs is incorporated herein for all purposes.

38.    At the times the Helmet left the possession of the Riddell Defendants, the Riddell Defendants knew or should have known of a risk of harm presented by the Helmet.

39.    The Riddell Defendants marketed the Helmet without adequately warning of the danger or providing instructions for safe use.

40.    This marketing defect rendered the Helmet dangerous beyond what an ordinary user of the Helmet, with ordinary knowledge common to the community would have anticipated concerning the product's characteristics.

41.    The above-referenced marketing defect was the producing cause of Scott's injuries and Plaintiffs' damages.

## COUNT FOUR: NEGLIGENCE

42.    The Riddell Defendants were negligent in their design, testing, manufacture, marketing, distribution, and/or sale of the subject Helmet in the following respects:

   a.    failing to design, manufacture, and recondition the Helmet with a safe means of attenuating and absorbing the foreseeable forces so that upon impact the helmet would minimize and/or reduce the force and energy directed to the brain;

   b.    designing, manufacturing, and reconditioning the Helmet with a shock attenuating system which was not as safely configured as the Riddell Defendants' other products;

   c.    failing to properly and adequately test the Helmet;

   d.    failing to properly and adequately modify the design of the shock absorbing characteristics of the Helmet to provide a helmet which is capable of attenuating and absorbing the foreseeable forces of tackle plays during football and which can result in a brain injury to a player—including but not limited during the original manufacture and subsequent reconditioning;

   e.    failing to provide appropriate and necessary instructional materials and warnings regarding the use of the Helmet in a fashion which would reduce or minimize the risk of brain injuries;

   f.    failing to provide appropriate information, warnings and/or instructions regarding the fact that other model helmets provided greater shock attenuation, thereby reducing the energy the Helmet allows to be delivered to the brain; and

   g.    other acts of negligence that may be discovered during the course of this matter.

43.    Each of these acts and omissions by the Riddell Defendants, singularly or in combination with others, constituted negligence that proximately caused Scott's extensive injuries and Plaintiffs' damages.

## COUNT FIVE: GROSS NEGLIGENCE

44.    Each of the foregoing paragraphs is incorporated herein for all purposes. Defendants' tortious conduct was malicious, fraudulent, and/or grossly negligent.

45.    Defendants' malicious, fraudulent, and/or grossly negligent conduct was carried out by Defendants personally, through Defendants' authorized agents, employees, managers, officers, directors, vice-principals, and/or principals of the Defendants who were acting within the course and scope of their agency, employment, partnership, and/or joint venture. Alternatively, Defendants' malicious, fraudulent, and/or grossly negligent conduct was subsequently approved by or ratified by Defendants.

46.    Defendants intentionally breached the legal duties they owed Plaintiffs such that they could take undue advantage of Plaintiffs and/or otherwise maliciously treat Plaintiffs. The acts or omissions of Defendants, when viewed objectively from the Defendants' standpoint, involved an extreme degree of risk when considering the probability and magnitude of the potential harm to Plaintiff and others.

47.    Additionally, Defendants had actual, subjective awareness of the risk to Plaintiffs and others but proceeded anyway with a conscience indifference to the rights, safety, or welfare of Plaintiffs and others.

48.    Defendants' conduct was performed and/or designed with a specific intent to cause substantial injury or harm to Plaintiffs. As alleged herein, Defendants' conduct is an example of why punitive damages exist, and Plaintiffs allege that Defendants' conduct rises to the level warranting the imposition of exemplary damages against Defendants at trial.

## V.
## DAMAGES

49.    Each of the foregoing paragraphs is incorporated herein for all purposes.

50.    The acts of Riddell Defendants set forth above were a proximate and/or producing cause of Plaintiffs' injuries and damages as follows:

    a.    General damages;

    b.    Actual damages;

    c.    Past and future medical expenses and rehabilitative expenses;

    d.    Past and future physical pain and suffering;

    e.    Past and future mental anguish;

    f.    Past and future disfigurement;

    g.    Loss of future earning capacity;

    h.    Lost wages Plaintiffs have suffered in the past;

    i.    Exemplary damages;

    j.    Costs of court;

    k.    Pre-judgment interest;

    l.    Post-judgment interest; and

    m.    All other relief, in law and in equity, to which Plaintiffs may be justly entitled.

## VI.
## DEMAND FOR JURY

51.    Plaintiffs demand a jury trial and tender the appropriate fee.

## VII.
## PRAYER

Plaintiffs respectfully request that Defendants be cited to answer and appear, and, that upon final trial, Plaintiffs recover damages as specified above from Defendants, plus costs of court, pre-judgment and post-judgment interest at the legal rate, and have such other and further relief, general and special, at law or in equity, to which Plaintiffs may show themselves entitled.

Respectfully submitted,

**DEANS & LYONS, LLP**

_(signature)_

_____

**Michael P. Lyons**
Texas Bar No. 24013074
**Christopher J. Simmons**
Texas Bar No. 24058796
**Stephen Higdon**
Texas Bar No. 24087719
325 N. Saint Paul St., Ste. 1500
Dallas, Texas 75201
(214) 965-8500 (t)
(214) 965-8505 (f)
mlyons@deanslyons.com
csimmons@deanslyons.com
shigdon@deanslyons.com

–and–

**ANAPOL WEISS**

**Larry Coben, Esq.**  (*pro hac pending*)
8700 E. Vista Bonita Drive, Suite 268
Scottsdale, Arizona 85255
(480) 515-4745 (t)
(480) 515-4744 (f)
lcoben@anapolweiss.com

**ATTORNEYS FOR PLAINTIFFS**